UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE APPLICATION OF HELIOS VENTURES FZE FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | Case No. 21-MC _____ |

## DECLARATION OF JAMES DRAKE QC

I, James Drake QC, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States, as follows:

**I.   INTRODUCTION**

1. I am a barrister and Queen's Counsel practising in London and specialising in international commercial law. I have been practising in the field of commercial litigation (and arbitration) for over 35 years, including in London, New York and Australia. I have extensive experience as an advocate and legal adviser in civil claims in all areas of commercial law before the courts of England and Wales.

2. A copy of my curriculum vitae is attached hereto as **Exhibit 1.**

3. I submit this declaration in support of the application by Helios Ventures FZE ("Helios") for an order from this court pursuant to 28 U.S.C. § 1782 for the taking of discovery from (a) VistaJet US Inc. ("VistaJet US") and (b) Rhône Capital L.L.C. and Rhône Group L.L.C. (together, "Rhône") (collectively, the "Respondents") for use by Helios in foreign proceedings, namely the English Claim (as defined below) (the "1782 Application").

4. Unless otherwise indicated, all facts set forth in this declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents; and (c) information and

1

instructions supplied to me by Helios by its officers, directors, and employees, or by professionals retained by it.

5. All exhibits attached hereto are true and accurate copies, or true and accurate excerpts of those copies.

6. Please note that capitalised terms not otherwise defined herein shall have the meanings ascribed to them in the 1782 Application and in the underlying contractual documents.

**II.    FACTUAL BACKGROUND**

7. Helios is a Free Zone Establishment (the equivalent of a limited liability company limited by shares) registered in the Free Zone in Ajman in the United Arab Emirates. Helios is an investment holding company. The beneficial owner of Helios is Mr Leonidas Loucas ("Mr Loucas"), a Cypriot businessman.

8. VistaJet Group Holding Limited ("VistaJet Malta") is a company incorporated in Malta, and is in the business of operating private aircraft charters. I am instructed as follows: (a) VistaJet Malta was the global holding entity of the "VistaJet" branded group of companies until 6 December 2018, (b) Thomas Flohr ("Mr Flohr"), a Swiss businessman, is founder and CEO of VistaJet Malta, and (c) Mr Flohr holds indirectly (through Vista Global Holding Ltd., a company incorporated in Dubai, UAE) the majority of VistaJet Malta's shares. Helios is a shareholder of "Ordinary B Shares" in VistaJet Malta.

9. I am instructed that Mr Loucas and Mr Flohr are personally acquainted. I am also instructed that, in 2016, Mr Flohr sought to raise capital for VistaJet Malta's international expansion and that, in that context, Mr Loucas and Mr Flohr discussed possibilities regarding an investment by Mr Loucas in VistaJet Malta in order to help the company expand internationally, including to the United States.

10. A dispute has arisen between Helios and Mr Flohr in relation to certain option agreements entered into between them in respect of shares in VistaJet Malta: (i) a Put Option Agreement dated 6 February 2017 (the "<u>Put Option Agreement</u>"); and (ii) a Call Option Agreement dated 28 June 2017 (the "<u>Call Option Agreement</u>") (together, the "<u>Option Agreements</u>"). The Option Agreements are governed by English law and provide that "*the courts of England*" are to have exclusive jurisdiction to settle any dispute arising out of or in connection with them. A copy of the Call Option Agreement is appended to this declaration as **Exhibit 2**. A copy of a draft of the Put Option Agreement along with an amendment agreement amending the same are appended to this declaration as **Exhibit 3**.[1]

Put Option Agreement

11. By the Put Option Agreement,[2] Mr Flohr granted to Helios the First Option and Second Option, which, if exercised by Helios, required Mr Flohr to purchase from Helios specified amounts of Ordinary B Shares in the capital of VistaJet Malta on the terms and subject to the conditions set out in the Put Option Agreement (see clauses 2.1 and 2.2). The Put Option Agreement further provides: (i) the consideration payable by Mr Flohr for the sale of the shares subject of the Options (US$26,000,000 for the First Option Shares and US$13,000,000 for the Second Option Shares); and (ii) the period during which Helios would be entitled to serve Exercise Notices of the First Option and Second Option.

12. By letters dated 14 December, 2017, Helios served notices under the Put Option Agreement notifying Mr Flohr of its exercise of the Put Option. Copies of these notices are appended to this declaration as **Exhibits 5-6.** The next day, Mr Flohr sent a "Purchaser Notice",

---

[1] I am instructed that Helios does not have an executed final copy of the Put Option Agreement (though it has requested it from Mr Flohr in the letter before claim: at **Exhibit 4**). As set out below in this declaration, Mr Flohr has written a "Purchaser Notice" apparently on the basis of the Put Option Agreement being concluded: at **Exhibit 7**. Mr Flohr and VistaJet Malta have also signed an amendment agreement amending the Put Option Agreement, which notes at paragraph (B) of its recitals that the Put Option Agreement was entered into on 6 February 2017: at **Exhibit 3**.

[2] All capitalised terms in paragraphs 11-15 have their definitions as set out in the Put Option Agreement.

3

which notice noted that Helios's notices were served earlier than permitted under the Put Option Agreement and stated that "*notwithstanding early option exercise…the First Option Trigger date is 06 February 2020 plus the First Option Completion Date ending 05 February 2021…the Second Option Trigger Date is 30 March 2020 plus the Second Option Completion Date ending 29 March 2021.*" A copy of the Purchaser Notice of 15 December, 2017 is exhibited to this declaration as **Exhibit 7.**

13. By letter dated 29 January, 2021, Helios wrote to Mr Flohr requesting payment in accordance with the Put Option Agreement. A copy of this letter is appended to this declaration as **Exhibit 8.**

14. By letter dated 4 February, 2021, Linklaters LLP ("<u>Linklaters</u>"), a law firm, wrote to Helios, noting, in summary, that Mr Flohr had "*not accepted*" Helios's notices of 14 December, 2017 and that Mr Flohr's notice of 15 December, 2017 was a "*counter-offer to Helios to the effect that he was prepared to accept an early triggering of the options in December 2017…and subject to contract.*" Linklaters also said that this "*counter-offer was not accepted by Helios*" and had "*expired*". A copy of this letter is appended to this declaration as **Exhibit 9.**

15. The parties are in dispute whether Mr Flohr is contractually obligated to make payment under the Put Option Agreement in exchange for the corresponding shares. This dispute appears to concern, inter alia, the proper construction of the Put Option Agreement and the effect of Mr Flohr's communications to Helios (i.e., the Purchase Notice), including (among other issues) whether Mr Flohr is estopped from asserting that Helios's notices were served ahead of the time permitted under the Put Option Agreement.

Call Option Agreement

16. By the Call Option Agreement,[3] Mr Flohr granted Helios an Option to allow Helios, under certain conditions and circumstances, to convert certain amounts owing to Helios (the Convertible Equity, comprising namely, a loan of US$30,000,000, a Guaranteed Return of US$6,000,000, and interest in accordance with the terms of the Call Option Agreement) into a certain number of Ordinary A Shares in the capital of VistaJet Malta.

17. The circumstances and conditions that would result in the Option being exercised are set out in clauses 3.1 to 3.3 of the Call Option Agreement. In summary, (i) clause 3.1 provides for Mandatory Conversion where a Conversion Trigger occurred after 16 August, 2017 and prior to 31 December 31, 2017 (if the Convertible Equity has not been repaid); (ii) clause 3.2 provides that if no Conversion Triggered occurred, then the Convertible Equity may be converted based on a mutually agreed Valuation of VistaJet Malta after a good faith negotiation between Mr Flohr and Helios; and (iii) clause 3.3 provides that if there was no conversion on the basis of the foregoing, Helios may, "*at its sole discretion*", exercise the Option on the basis of a Per Share Price based on the Valuation of VistaJet Malta of US$1,250,000,000.

18. I am instructed that Helios intends to claim (and does not understand Mr Flohr to dispute) that the circumstances in clauses 3.2 and 3.3 have not materialised. There is, however, a dispute between the parties as to whether there was a Conversion Trigger (in accordance with clause 3.1) such that a Mandatory Conversion occurred.

19. On 26 December, 2017, Mr Tobias Schramm (general counsel of VistaJet Malta) emailed Helios stating that Mandatory Conversion occurred on 24 August, 2017, as a result of transactions involving Rhône, and relying on advice from Linklaters. A copy of this email is appended to this declaration as **Exhibit 10.** A copy of a letter from Linklaters to Helios

---

[3] All capitalised terms in paragraphs 16-19 have their definitions as set out in the Call Option Agreement.

5

is appended to this declaration as **Exhibit 11.** I am instructed that Helios disputes whether 2017 transactions (the "Rhône Transactions") whereby, in summary, Rhône subscribed to US$150,000,000 in convertible redeemable shares of VistaJet Malta and obtained from Mr Flohr shares in VistaJet Malta of the same type for US$50,000,000 (based on the valuation established by Rhône), constituted a "Conversion Trigger" as that term is defined in the Call Option Agreement (defined as "*an investment of at least US$200,000,000.00 by a third party in the shares of the Company.*"). This dispute about the facts, nature and circumstances of the Rhône investment and how it impacts Mr Flohr and Helios's rights under the Call Option Agreement is anticipated to be the subject of the English Claim.

### III. ENGLISH PROCEEDINGS

20. As noted, the Option Agreements provide for English law and for the exclusive jurisdiction of the English courts and I am instructed that Helios intends to bring proceedings in the English court in respect of the dispute just described. To this end, Helios has issued the "letter before claim" as explained below. I am instructed that Helios has also asked its solicitors to prepare other claim documents, such as a Claim Form and Particulars of Claim.

21. The Civil Procedure Rules ("CPR") require parties in a dispute to take certain steps prior to the issuance of proceedings in an effort to (a) inform each other as to the matters in dispute and (b) resolve the dispute at that early stage if possible. Pursuant to the CPR's 'Practice Direction -- Pre-action Conduct and Protocols', Helios's legal representatives have sent to Mr Flohr's legal representatives a "letter before claim" explaining the basis of the anticipated claim. A copy of the letter before claim is appended to this declaration as **Exhibit 4.**

22. I am instructed that, subject to any response from Mr Flohr's legal representatives, Helios intends to commence proceedings against Mr Flohr in the High Court of Justice of England and Wales for, *inter alia*, breach of contract, viz., breaches of the Put

Option Agreement and Call Option Agreement and intends to seek, *inter alia,* declaratory relief, specific performance, damages, interest, and costs. This is the "English Claim".

23. The High Court is the first instance court for civil claims of this nature. A claim is commenced by way of "issuing" a Claim Form, which is to be supplemented by a Particulars of Claim (which may be filed at the same time or a certain amount of time after). (These pleadings (or "statements of case") are analogous to a "complaint" in US proceedings.)  It is a matter for Helios to serve these documents on the defendants (in accordance with the service provisions of the CPR) and, following successful service and absent any objection to jurisdiction, it is a matter for the named defendants to file and serve a Statement of Defence (and Counterclaim, if any).

24. Once the pleadings are closed, the parties will be required to conduct a document disclosure process, where relevant non-privileged documents in the control of the parties are to be disclosed to the other party.  By what is known as 'standard disclosure', which is the mode of disclosure that is to take place absent a court order, each party is to disclose the documents within its control (a) on which it relies, and (b) which adversely affect its own case or support another party's case.

25. The parties will also be free to adduce testimonial evidence. In civil matters such as this dispute, such evidence is generally introduced in the form of witness statements, which are served on the opposing party and which, in the ordinary course, will stand for the witness's examination in chief at the trial of the action.  It is also possible to for a party to issue a 'witness summons' (in some circumstances the permission of the court is required to do so) for a witness to produce documents and/or provide testimonial evidence for use at the trial but that facility is not available where the witness is outside the jurisdiction.  In civil proceedings in England, except in rare circumstances (e.g., where the witness is unavailable to attend trial) there is no mechanism available to conduct pretrial testimonial examination of litigants or non-

parties; and even in the rare circumstances where it is permitted the examination is solely for use at trial.

26. The English courts generally conduct "case management conferences" to manage the process from the close of pleadings through to trial.

27. Any trial of the claims foreshadowed in this dispute will take place before a single judge with no jury. The judge, of course, is an independent arbiter unconnected to the parties. At the trial, the parties will have the opportunity to make opening and closing submissions (including written skeleton agreements (analogous to "trial briefs") in advance of the trial), and cross-examine both fact and expert witnesses (recalling that the usual course is for the witness statement or expert report to stand as the evidence in chief of the witness). England is a common law jurisdiction, and the English courts adopt what resembles a conventional "adversarial" model. Following the trial, the judge will issue a judgment and make orders as to the costs and other consequences; this may be *ex tempore* but is ordinarily delivered in writing after the close of the trial. There is no automatic right of appeal, and a losing party requires permission to appeal to the Court of Appeal. Such permission may, in the first instance, be sought from the trial judge and, if denied, may be sought from the Court of Appeal itself. There is further, limited scope for appeal from the Court of Appeal to the Supreme Court of the United Kingdom.

28. Depending on the conduct of the parties and availability of court resources, it would be reasonable to expect that the time period from issuance of Claim Form through to a final conclusion on the merits will be something in the order of two to three years.

## IV.   JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

29. I am instructed that neither of the Respondents is present in England and Wales, and there does not appear, at present, to be any proper basis on which the English court could exercise *in personam* jurisdiction over them. It follows that the English court will not be in a

position to make an order to compel documentary disclosure and provision of testimonial evidence from the Respondents in the course of the English Claim.  It is for this reason that this 1782 Application is made.

30. By its 1782 Application, Helios is seeking documents and witness evidence from the Respondents (as further set out in the 1782 Application) on the basis that the Respondents are in possession, custody or control of information that is relevant to the matters in issue in the English Claim.  (For ease of reference, I set out the Helios document requests in a schedule to this declaration.)[4]  As explained below, the information is sought on the basis that it will assist in establishing facts relevant to address, *inter alia,* the position adopted by Mr Flohr that (a) he is not required to complete the Put Option and (b) a Mandatory Conversion under the Call Option had in fact taken place on 24 August 2017 (as a result of transactions involving Rhône**).**

31. In this respect, I am instructed as follows:

   A. VistaJet US is an affiliate of VistaJet Malta and is likely to possess information in relation to VistaJet Malta's business operations and plans in the US, which, according to Helios, were the purported bases of Helios's investments and the related Option Agreements which form part of that investment arrangement. This relates to Requests 1 and 2 for documents and communications relating to the Put Option Agreement and the Call Option Agreement.

   B. Rhône is the party that negotiated an investment in VistaJet Malta in 2017 which Mr Flohr now contends amounts to a Conversion Trigger under the Call Option Agreement. Rhône should therefore be in possession of relevant information regarding the structure of that transaction (including the plans for the use of funds), subsequent restructurings

---

[4] I am also instructed that corresponding requests for testimonial evidence have also been included in the application.

of the VistaJet group of companies, and Mr Flohr's representations regarding the effect of Rhône's investment on the rights and obligations of Helios and Mr Flohr, including under the Call Option Agreement. This relates to Request 3 for documents and communications relating to VistaJet Malta, Mr Flohr and Rhône relating to and to effect the Rhône Transactions.

V. **ENGLISH COURT'S RECEPTIVENESS TO SECTION 1782 APPLICATION AND NON-CIRCUMVENTION OF ENGLISH PROOF-GATHERING POLICIES**

32. English courts will, and as a general matter do, give effect to a request for assistance pursuant to 28 U.S.C. § 1782. As a matter of English law, there is nothing axiomatically unacceptable about the use of § 1782 to obtain evidence in the US for use in English proceedings, and that is so even though the means by which such evidence is gathered is not available under English law (such as the taking of depositions). The only basis for objection to such a course is where the process would be abusive or oppressive, neither of which appears to be the case here.

33. In general, under English law, factual evidence is admissible where relevant without regard to how the party adducing the evidence has obtained it. In particular, evidence is admissible where obtained with the assistance of foreign courts, provided that the method by which it has been obtained is lawful in the court in which it is obtained. More specifically, it is well settled that discovery obtained via § 1782 is as a matter of principle admissible in proceedings in England: se*e South Carolina Insurance Co. v. Assurantie Maatschappij "de Zeven Provincien" N.V.* [1987] A.C. 24.[5]

34. In *South Carolina co v Assurantie N.V.*, the House of Lords (the predecessor to the UK Supreme Court) overturned the Court of Appeal's judgment that use of information obtained from a § 1782 application was inherently objectionable and abusive because it

---
[5] A true and accurate copy of this case is attached hereto as **Exhibit 13**.

interfered with the court's control of its own procedure. To the contrary, the House of Lords held that it could not be said that a party who made application to the US court for assistance had somehow departed from or interfered with the procedure of the English court: "*All they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe they need in order to prepared and present their case.*"[6]

35. A similar decision was reached by the High Court in *Nokia Corporation v. Interdigital Technology Corp. (*a true and accurate copy of which is attached at **Exhibit 12)**. There the English court denied a request to restrain a party from making a § 1782 application in the United States saying that "*it cannot be said a priori or that the material which would be obtained on discovery in this case, as sought in the section 1782 proceedings, would not be capable of being deployed in these proceedings*".[7] The court further stated that "*the English court should not seek to circumscribe the discretion possessed by the* [US] District court *by imposing its own view as to the appropriateness of the classes of documents sought by reference to the issues in proceedings as they stand. It is legitimate for the requesting party to use the* [§ 1782] *request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings, if necessary after appropriate amendment.*"[8]

36. In my experience as counsel, including acting in numerous civil claims before the English courts, I have no reason to believe that (a) the English court will be unreceptive to relevant evidence obtained by means of the judicial assistance requested in the 1782 Application, and (b) the use in the English Claim of such evidence as is obtained by this application is contrary to the policies of the law of England and Wales.

---

[6] Id.
[7] *Nokia Corporation v. Interdigital Technology Corp.* [2004] EWHC 2920 at [32].
[8] Id.

## VI. ACCESS TO COURT RECORDS

37. Under English law, there is a principle of open justice and hearings in English courts will generally be open to the public.

38. It may be important to note, however, that documents obtained from other parties by way of disclosure are protected from collateral use both as a matter of common law and pursuant to the CPR. Specifically, CPR 31.22(1) provides that a party to whom a document has been disclosed may use the document *only* for the purpose of the proceedings in which it is disclosed, except where: (a) the document has been read to or by the court or referred to at a hearing which has been held in public; (b) the court gives permission; or (c) the party who disclosed the document and the person to whom the document belongs agree. The English court may also make an order restricting or prohibiting the use of a document which has been disclosed, even where the document has been read to or by the court or referred to at a hearing which has been held in public. A ready example is where the document contains confidential information.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the United States that the foregoing is true and correct.

Executed on __5th__ May 2021
in London, England

_____
James Drake QC

**SCHEDULE**

REQUESTS

1.     All Documents and Communications relating to the Subscription Agreement and Put Option Agreement, including Documents and Communications among Mr Thomas Flohr, VistaJet Malta, and Helios in response to Helios' put notices of December 14, 2017 and the corresponding purchaser's letter dated December 15, 2017.

2.     All Documents and Communications relating to the Call Option Agreement, including those relating to the December 22, 2017 communication of the Mandatory Trigger (as defined in the Call Option Agreement) being activated and subsequent communication, including Documents pertaining to the purported Mandatory Conversion (as defined in the Call Option Agreement) and the transfer of shares to Helios.

3.     All Documents and Communications relating to the Rhône Transactions, including Documents and Communications relating to the agreements among VistaJet Malta , Mr Flohr, and Rhône and VistaJet Malta resolutions to effect the Rhône Transactions, including:

   a. the Subscription Agreement between Rhône and VistaJet Malta ;
   b. the Share Purchase Agreement between the Rhône and Mr Thomas Flohr;
   c. the Shareholders Agreement among the Turbo Entities, VistaJet Malta, and Mr Thomas Flohr;
   d. the Management Rights Agreement among the Turbo Entities, VistaJet Malta , and Mr Thomas Flohr.
   e. the resolution dated August 23, 2017 amending the articles of association of VistaJet Malta
   f. the resolutions dated August 24, 2017 providing for share buybacks from Mr Thomas Flohr by VistaJet Malta , or other share issuances, including any bonus share issue, to Mr Flohr, and allotment of shares to the Turbo Entities.